STATE OF INDIANA
IN THE HUNTINGTON COUNTY CIRCUIT COURT

| | |
|---|---|
| KRATZER FARMS INC., GARY KRATZER, PINKERTON FARMS INC., DANIEL PINKERTON, PHIL PASKO FARMS INC., CALEY BROS. FARMS, INC., CALEY FARMS INC., DK FARMS, INC., DARRELL BLAIR, AND SELDOM REST FARMS OF HUNTINGTON, INC., | CAUSE NO: 35C01-2206-PL-000336 |
| PLAINTIFFS, | |
| V. | |
| INDIANA GRAIN BUYERS AND WAREHOUSE LICENSING AGENCY, | |
| DEFENDANT. | |

## AMENDED COMPLAINT

Plaintiffs Kratzer Farms, Inc., Gary Kratzer, Pinkerton Farms Inc., Daniel Pinkerton, Phil Pasko Farms Inc., Caley Bros. Farms, Inc., Caley Farms Inc., DK Farms Inc., Darrell Blair, and Seldom Rest Farms of Huntington, Inc. (collectively the "Farmers"), for their complaint against the Indiana Grain Buyers and Warehouse Licensing Agency (the "Agency"), state as follows:

### INTRODUCTION

1.      When a grain elevator in a rural community goes bankrupt, the potential for harm goes further than just the financial hardship suffered by the elevator's owners. A typical elevator serves many farmers in a community. These farmers deliver their grain to the elevator, which often stores the grain for the farmer until the farmer is ready to sell. One year's grain crop can make or break a farm, meaning that farmers could entrust their entire farm's livelihood in the bins of the local elevator. The failure of the elevator,

1

therefore, triggers a potential domino effect in a small community. The elevator fails. Then multiple farms that stored grain in that elevator fail. Then those businesses that sold seed, fertilizer, and machinery to these farmers fail. An entire community could be devasted by the failure a single grain elevator.

2.     To protect grain farmers from this type of catastrophic financial loss resulting from the failure of grain elevator, the General Assembly created the Indiana Grain Indemnity Program, codified in Title 26 of the Indiana Code.

3.     The Grain Indemnity Program is made up of two parts. The first part is the Agency, which is responsible for licensing companies that buy or store grain in in Indiana. I.C. § 26-3-7 *et seq*.; 824 IAC 2 *et seq*.[1] Licensing requires that grain buyers in Indiana maintain strict financial requirements, such as a positive net-worth and asset-to-liability ratio of at least 1:1. Licensee must demonstrate their financial health with annual license renewals that contain review-level financial statements.

4.     The second part of the Indiana Grain Indemnity Program is the Indiana Grain Indemnity Fund ("Fund"), a pool of funds paid into by grain farmers to reimburse those farmers with losses if a licensee fails. The Fund is overseen by the Indiana Grain Indemnity Corporation ("IGIC"). The director of the Agency reports regularly to IGIC regarding whether any licensed grain buyers are in financial trouble.

5.     In this case, the Grain Indemnity Program was prevented from working as the General Assembly intended because of the failure of the Agency over a course of years. The Agency provided a grain buying license to Salamonie Mills, Inc. ("SMI"), a regional

---

[1] The General Assembly amended the Indiana Grain Buyers Warehouse Licensing Agency statute in 2021. However, the applicable version of the statute for this case, which arose out of facts and decisions in 2020, is from 2020.

grain elevator located in Wells and Huntington counties. From 2012 through 2020, SMI's financial health did not meet the state's strict grain licensure requirements. Every year in its license renewal application, SMI reported a deteriorating financial condition to the Agency. SMI's required "positive net worth" fell deeper and deeper into a negative net worth by millions of dollars. The Agency continued to relicense SMI each year.

6.      By early 2020, SMI faced foreclosure from its main lender, First Farmers Bank & Trust ("FFBT"). Only when this foreclosure became eminent did the Agency suspend SMI's license on March 3, 2020.  The Agency eventually selected March 20, 2020 as the "failure" date to use to determine what farmers' grain deposits would be eligible for reimbursement from the Fund.

7.      The Farmers appealed the Agency's selected "failure" date decision. During discovery in the administrative appeal, the Farmers discovered the Agency had known for years that SMI was millions of dollars in debt and was in violation of many of the Agency's key financial requirements for a licensed grain buyer. Nonetheless, the Agency ignored the statutory requirements for grain licensing and re-issued SMI's license year after year.

8.      When the Agency ignored the statutory requirements for grain licensing and then arbitrarily picked a "failure" date that is contrary to its statutory mandate, farms were injured when that licensed grain buyer collapsed. The Indiana Grain Indemnity Program only works when all participants uphold their statutory duties. Farmers paid into the Fund, as statute requires. IGIC managed the Fund so that it would be available in the event of failure. But the Agency ignored its duties, repeatedly licensing an already failed grain buyer for years, in direct contravention of the laws the Agency is supposed to follow.

## THE PARTIES, JURISDICTION, AND VENUE

9.      Daniel Pinkerton farms in Huntington and Wells County, Indiana. He resides at 696 S. 200 W. Warren, IN 46792.

10.     Pinkerton Farms Inc. is an Indiana corporation that does business in Huntington and Wells County. It is based in Huntington County.

11.     Gary Kratzer farms in Huntington and Wells County, Indiana. He resides at 195 W. 900 S., LaFontaine, IN 46940.

12.     Kratzer Farms, Inc. is an Indiana corporation that does business in Huntington and Wells County. It is based in Wabash County, Indiana.

13.     Phil Pasko Farms Inc. is an Indiana corporation that does business in Huntington and Wells County. It is based in Huntington County, Indiana

14.     Caley Bros. Farms, Inc. is an Indiana corporation that farms in Huntington and Wells Counties. It is based in Wells County, Indiana.

15.     Caley Farms, Inc. is an Indiana corporation that does business in Huntington and Wells Counties. It is based in Wells County, Indiana.

16.     DK Farms Inc. is an Indiana corporation that does business in Huntington and Wells Counties. It is based in Huntington County, Indiana.

17.     Darrell Blair farms in Huntington County. He resides at 5932 E. 500 S. Markle, IN 46770.

18.     Seldom Rest Farms of Huntington, Inc. is an Indiana corporation that farms in Huntington County. It is based in Huntington County.

19.     The Indiana Grain Buyers and Warehouse Licensing Agency is a state agency that is part of the Indiana Department of Agriculture. The Agency has statewide jurisdiction.

20.     This Court has jurisdiction over this matter because the SMI locations and many of the farms at issue are in Huntington County, Indiana.

21.     Venue is preferred in this Court under Trial Rule 75 because the SMI locations at issue and many of the farms involved were in Huntington County. Ind. R. Trial P. 75(A)(2). The Agency also conducted inspections of SMI in Huntington County.

22.     The Farmers provided the Agency notice of their tort claims via letter dated February 24, 2022. See Ind. Code § 34-13-3 *et seq.*

23.     The Agency denied the Farmers' tort claims via letter dated March 28, 2022.

**INDIANA GRAIN BUYERS LAW**

24.     The Indiana Grain Indemnity Program is made up of two organizations: the Agency, which ensures that any elevator buying grain in Indiana is licensed; and IGIC, which manages the Fund, a producer-funded account to pay farmers' claims when an elevator fails.

25.     The Agency is responsible for administering licenses for grain buyers and warehouses under I.C. § 26-3-7, the Indiana Grain Buyers and Warehouse Licensing and Bonding Law (the "Grain Buyer's Law").

26.     An entity may not operate as a grain buyer in Indiana without a license from the Agency.  I.C. § 26-3-7-4(a), (b).

27.     The statute requires the director of the Agency to ensure a grain buyer is in a suitable financial position to conduct business as a grain buyer. I.C. § 26-3-7-3(b)(1).

28.     To obtain an initial license, the applicant must submit an application form, pay a fee, demonstrate a current asset to liability ratio of 1:1, and submit "review level financial statement or better financial statement that reflects the applicant's financial situation on a date not more than fifteen (15) months before the date on which the application is submitted." I.C. § 26-3-7-6(c), (d), (e).

29.     An applicant for a license may not be licensed unless all the applicant's facilities qualify for a license. I.C. § 26-3-7-4(b).

30.     The General Assembly set the minimum thresholds for the Agency to determine whether to an applicant license.  These include:

  a. Applicants must have, as evidenced by the financial statements, a minimum positive net worth to hold any license. I.C. §§ 26-3-7-4(f); 26-3-7-16.

  b. Applicants must have a current asset to current liability ratio of one to one (1:1). *Id.*; I.C. § 26-3-7-6(e).

  c. Applicants must file a bond or letter of credit with the Agency for an amount set by statute. I.C. §§ 26-3-7-9; 26-3-7-10; 824 IAC 2-4-4. In certain circumstances, a licensee with a deficiency in the minimum positive net worth may add to the amount of bond or letter of credit an amount equal to the deficiency to satisfy the minimum net worth requirement. I.C. § 26-3-7-10(g)-(j).

  d. Applicants must also show good character, that they have a good business reputation, and have not been found guilty of a crime that would affect their ability to conduct business with integrity. I.C. § 26-3-7-7.

31.    To ensure licensees maintain the standards of the Grain Buyers Law, licensees must actively renew their license on an annual basis with the Agency.

32.    Every year, licensees must submit "review level" current financial statements, an updated financial profile form, and a renewal license fee. I.C. § 26-3-7-6.1; 824 IAC 2-4-14.

33.    The renewal materials, including financial statements, are due not more than 90 days after the end of a licensee's fiscal year. *Id.*

34.    In addition, the Agency audits licensees to monitor the licensees' financial position and stability. 824 IAC 2-6-1; I.C. § 26-3-7-3(a)(14).

35.    The Agency sends out letters to licensees indicating that the minimum net worth is a "requirement" and requiring that a licensee "shall" maintain that minimum net worth.

36.    At all times while licensed, a licensee must meet certain minimum requirements.

    a.    A licensee always must have *and maintain* a positive net worth to hold any license or do business as a grain buyer. I.C. § 26-3-7-4(f).

    b.    A licensee always must have *and maintain* a current asset to current liability ration of 1:1. I.C. § 26-3-7-16(a).

    c.    A licensee also always must *maintain* at least 80% of its unpaid balance of grain payables in unencumbered assets with: (a) company owned grain, (b) cash on hand, (d) cash held in licensed financial institutions, (e) irrevocable letters of credit, etc. I.C. § 26-3-7-4(e).

37.     A grain buyer's license assures producers that if they do not opt out, the producer is protected by the Indiana Grain Indemnity Program.

**FAILURE OF LICENSED GRAIN BUYER**

38.     There are instances, like this case, when a licensee collapses, and the Indiana Grain Indemnity Program steps up to address the losses incurred by farmers who delivered grain to a licensee but have not yet been paid. I.C. § 26-4-1-15.

39.     The Fund is a fund established by the Legislature to pay producers for losses incurred due to the failure of a licensed grain buyer or warehouse. I.C. § 26-4-4-1.

40.     The Fund is administered by IGIC. I.C. § 26-4-3-7.

41.     Upon request of the director of the Agency and approval of the IGIC board, IGIC compensates claimants from the Fund pursuant to applicable Indiana law. I.C. § 26-4-3-9(a)(11).

42.     The Fund is financed by premiums paid by Indiana grain producers. I.C. §§ 26-4-4-4; 26-4-4-6.

43.     The Fund currently has about $32 million in it.

44.     The Agency and IGIC "work closely together."

45.     The trigger for determining whether the Fund should compensate farmers for grain losses is determining when a licensee "failed." I.C. § 26-4-4-1. "Failed" or "failure" means any of the following:

(A)  The inability of a licensee to financially satisfy fully all obligations due to claimants.
(B)  Public declaration of a licensee's insolvency.
(C)  Revocation or suspension of a licensee's license, if the licensee has outstanding indebtedness owed to claimants.
(D)  Nonpayment of a licensee's debts in the ordinary course of business, if there is not a good faith dispute.

> (E) Voluntary surrender of a licensee's license, if the licensee has outstanding indebtedness to claimants.
> (F) Involuntary or voluntary bankruptcy of a licensee.

I.C. § 26-7-3-2(14)(2017).

46.    Only grain delivered to a licensee for sale or storage not more than 15 months before the date of failure may be considered in determining the total proven storage and financial obligations due to depositors. I.C. § 26-7-3-16.5(e).

## SALAMONIE MILLS COLLAPSES

47.    SMI was an Agency-licensed grain buyer and warehouse with locations in Huntington County and Wells County.

48.    On January 15, 2020, SMI defaulted on two notes to First Farmers Bank and Trust ("FFBT"), with unpaid balances of $3,125,205.54 and $4,961,308.54.

49.    On January 20, 2020, the Agency received a phone call from Mark Wolf, a FFBT employee (who also sat on the IGIC board of directors). He alerted the Agency director that SMI's loans with FFBT loans may not continue. The Agency then decided it would audit SMI.

50.    On or about February 18, 2020, the Agency audited SMI for the first time since 2018. According to the audit:

> a.    SMI had a net working capital of *negative* $11,768,264.25.
>
> b.    SMI failed the 1:1 ratio requirement.
>
> c.    SMI also failed the "80% test" because SMI could only cover 33% of its grain payables.

51.    Based on this information, the Agency could have declared February 18, 2020 as the failure date for SMI.

52.    Instead, the Agency allowed SMI to continue to operate.

53.    FFBT rejected SMI checks to producers for nonsufficient funds on or about March 2, 2020.

54.    The Agency temporarily suspended SMI's license on March 3, 2020.

55.    On March 20, the Agency further suspended SMI's license.

56.    On March 24, 2020, FFBT filed foreclosure proceedings against SMI in the Howard County Circuit Court.

57.    On April 24, 2020, SMI surrendered its grain buyer's license.

58.    The Agency initially selected April 24, 2020 as the "failure date."

59.    The Agency later selected March 20, 2020 as SMI's "failure date," and used this date to calculate the grain eligible for reimbursement from the Fund. The Agency decided this meant that any grain delivered to SMI prior to December 20, 2018 (15 months prior) was ineligible for reimbursement from the Fund.

60.    The Farmers had delivered grain to SMI prior to December 20, 2018 which SMI had not paid them for as of March 2020. The Agency decided this grain was ineligible for reimbursement from the Fund based upon its selection of March 20, 2020 as the "failure" date.

61.    The Farmers therefore lost their grain and were not paid for that grain, causing financial and other damages to each of the Farmers.

### THE AGENCY ALLOWED SMI TO VIOLATE THE LAW AND CONCEALED SMI'S FAILURE FROM THE FARMERS

62.    Discovery in an administrative review of SMI's failure revealed that SMI faced financial problems for years before the Agency suspended its license on March 3, 2020 and the Agency was aware of these problems.

63.     The Agency's own documents show that since at least 2015, SMI had a substantial *negative* net worth, consistently failed the required 1:1 current asset to liability ratio test, and submitted financial statements littered with red flags from SMI's own accountants.

64.     The Agency ignored these signs and approved license renewal after renewal for SMI.

65.     Indiana Code requires licensees to submit their renewal application and supporting materials (review level financial statements, bond information, etc.) within 90 days of the licensee's fiscal year end. I.C. § 26-3-7-6.1.

66.     SMI often submitted its financial statements and renewal application months late.

67.     Based on SMI's 2016 license renewal application, the Agency was aware of SMI's financial position at the end of 2015:

    a.   SMI had total current assets of $16,858,307.

    b.   SMI had total current liabilities of $20,262.077.

    c.   SMI had total assets of $19,079,277.

    d.   SMI had total liabilities of $23,842,736.

    e.   SMI showed a net loss of $289,282 in 2015.

    f.   As of the end of 2015, SMI was not in compliance with its bank debt covenants.

    g.   SMI had a bond of $500,000, which did not account for SMI's roughly *negative* $4 million net worth**.**

68.    Even though the Agency knew SMI had a negative net worth and a net loss and failed the 1:1 ratio test, the Agency issued SMI a license for 2016.

69.    Based on SMI's 2017 license renewal application, the Agency was aware of SMI's financial position at the end of 2016:

    a.  SMI had total current assets of $21,576.690.

    b.  SMI had total current liabilities of $24,124,190.

    c.  SMI had total assets of $23,557,633.

    d.  SMI had total liabilities of $27,566,453.

    e.  As of the end of 2016, SMI was not in compliance with its bank debt covenants.

    f.  SMI had a bond of $500,000, which did not account for SMI's roughly *negative* $4 million net worth**.**

70.    Even though the Agency knew SMI had a negative net worth and a net loss and failed the 1:1 ratio test, the Agency issued SMI a license for 2017.

71.    Based on SMI's 2018 license renewal application, the Agency was aware of SMI's financial position at the end of 2017:

    a.  SMI had total current assets of $23,352,296.

    b.  SMI had total current liabilities of $27,426,495.

    c.  SMI had total assets of $25,479,376

    d.  SMI had total liabilities of $30,767,745.

    e.  In 2017, SMI had a net loss of $1,232,774.

    f.  As of the end of 2017, SMI was not in compliance with its bank debt covenants.

      g.   The Agency was not aware of any plan to increase profits or decrease expenses.

      h.   SMI had a bond of $500,000, which did not account for SMI's negative net worth.

72.    Even though the Agency knew SMI had a large *negative* net worth, negative cash flow, negative operating margins, was in violation of bank loan covenants, and had a going concern uncertainty pointed out on the review level financial statements as part of the Agency application for renewal, the Agency issued SMI a license for 2018.

73.    Based on SMI's 2019 license renewal application, the Agency was aware of SMI's financial position at the end of 2018:

      a.   SMI had total current assets of $18,835,180.

      b.   SMI had total current liabilities of $24,141,332.

      c.   SMI had total assets of $20,678,935.

      d.   SMI had total liabilities of $27,286,055.

      e.   SMI had a net loss of $1,053,563 in 2018

      f.   As of the end of 2018, SMI was not in compliance with its bank debt covenants.

      g.   SMI had a bond of $500,000, which did not account for SMI's negative net worth.

74.    The Agency audited SMI three times in 2018 as part of a performance review since some of SMI's audits showed "concerns."

      a.   The first audit was on January 18, 2018.

b.  The second audit was on September 24, 2018. The auditor concluded SMI did *not* have the required amount of grain on hand.

c.  The third audit was on December 7, 2018. The auditor did not measure the grain bins. The Agency assessed its audit and the reviewed financial statement and allowed SMI to continue operating because it was almost the end of calendar year 2018 and the Agency had been focused on the failure a different licensee.

75.    At least one Agency employee tried to blow the whistle, raising concerns about SMI to the director prior to November 2018.

76.    Even though the Agency knew SMI had a large *negative* net worth, negative cash flow, negative operating margins, was in violation of bank loan covenants, and had a going concern uncertainty pointed out on the review level financial statements as part of the Agency application for renewal, the Agency issued SMI a license for 2019.

77.    At least one Agency employee became concerned when SMI *again* missed the license renewal deadline on March 31, 2019.

78.    SMI submitted a license renewal application form on April 15, 2019 to the Agency, but it lacked required information, notably the review level financial statement.

79.    An internal Agency email sounded another alarm on May 16, 2019, referring to SMI as a "problem license," noting SMI's required financial statement was already two months late, and reminding the director that SMI's 2017 net worth was *negative* $5,288,369.

80.    SMI finally submitted its 2018 year-end financial statement to the Agency on August 23, 2019, almost five months after it was due by law.

81.    SMI did not meet the minimum net worth requirement set forth by the statute. Instead, the Agency learned SMI's net worth had further deteriorated to *negative* $6.6 million as of December 31, 2018 (eight months earlier).

82.    SMI still did not meet the 1:1 current asset to current ratio test.

83.    Nevertheless, the Agency renewed SMI's license on September 23, 2019, for another year.

84.    By as early as September 2019, SMI and its accountant had disclosed SMI's precarious financial position to a FFBT vice president who also sat on the board for IGIC. This disclosure included information on problems with short term funding, hedging and options positions SMI was taking, income statements, accounts receivable, and gross profit margins.

85.    In September of 2019, SMI bounced multiple six-figure checks to farmers.

86.    By March of 2020, the Agency was aware of these bounced checks.

87.    The Agency could have declared SMI a "failure" effective September 2019 based on SMI's financial information.

88.    The Agency has explained that it did not declare SMI a failure in 2019 because the Agency believed it had discretion to decide when a licensee "fails" and because it was busy with another failure through the full year of 2019.

89.    The Agency was aware of SMI's financial deterioration for years. Internally, the Agency created a graph showing how egregiously SMI's financial health declined from 2015 until 2020. A true and accurate replication of the graph is included here:



90.     The Agency watched SMI's net worth go from *negative* $1.95 million in 2012 to *negative* $10.21 million in 2019 and still chose to renew SMI's license every year.

91.     The Agency chose not to audit SMI at all from December 2018 to February 2020, despite SMI's "downward trend."

92.     The Agency never alerted farmers delivering grain to SMI that SMI faced any financial problems until March 3, 2020, when SMI's license was suspended.

## <u>COUNT I: NEGLIGENCE</u>

93.     The Farmers incorporate the paragraphs above as if fully repeated here.

94.     The Agency had a duty to follow Indiana law.

95.     The Agency had a duty to issue licenses only to grain buyers that met the statutory requirements.

96.     The Agency had a duty to the Farmers to ensure licenses it issued to grain buyers were valid and in compliance with Indiana law.

97.     The Agency had a duty to accurately represent the financial health of its licensed grain buyers to Farmers who relied on the Agency.

98.     The Agency breached its duty.

99.     The Agency's breach caused damages to the Farmers.

100.    The Farmers suffered damages, including but not limited to lost grain, missed payments, consequential damages, and other agricultural damages.

101.    The Agency was negligent.

## COUNT II: VIOLATION OF INDIANA EQUAL PRIVILEGES AND IMMUNITIES CLAUSE

102.    The Farmers incorporate the paragraphs above as if fully repeated here.

103.    Article 1, Section 23 of the Indiana Constitution provides that "The General Assembly shall not grant to any citizen, or class of citizens, privileges or immunities, which, upon the same terms, shall not equally belong to all citizens."

104.    The Agency's interpretation and application of the Indiana Grain Buyers Law violates the Equal Privileges and Immunities Clause because the Agency treated the Farmers differently than similarly situated farmers who stored grain at other licensees.

105.    The Agency's interpretation and application of the Indiana Grain Buyers Law also violates the Equal Privileges and Immunities Clause because the Agency treated SMI differently than similarly situated licensees who are required to comply with Indiana law.

106.    The Agency's interpretation and application of the Indiana Grain Buyers Law also violates the Equal Privileges and Immunities Clause because the Agency requires certain licensees to comply with Indiana law—specifically the bonding and financial requirements for licensees—but does not require other similarly situated licensees to comply with those same requirements.

107.    The Agency's interpretation and application of the Indiana Grain Buyers Law also violates the Equal Privileges and Immunities Clause because the Agency's decision to require certain licensees to maintain financial minimums, while allowing SMI to violate the financial requirements for years means some farmers' grain at state-licensed facilities is protected by the Fund while similarly situated farmers' grain stored at other state-licensed facilities is unprotected.

108.    The Agency's preferential treatment given to SMI was not uniformly applicable and available to all similarly situated licensees.

109.    The Agency's preferential treatment given to farmers with grain at other licensees was not uniformly applicable and available to all similarly situated farmers or depositors.

110.    The special privileges the Agency granted to SMI violate Article I Section 23 of the Indiana Constitution, as applied.

111.    The special privileges the Agency granted to farmers who stored grain at different state-licensed grain buyers and warehouses other than SMI violates Article I Section 23 of the Indiana Constitution, as applied.

112.    The Agency violated the Farmers' rights under the Indiana Equal Privileges and Immunities Clause.

### COUNT III: VIOLATION OF FEDERAL EQUAL PROTECTION CLAUSE

113.    The Farmers incorporate the paragraphs above as if fully repeated here.

114.    This action arises under the Fifth and Fourteenth Amendments to the United States Constitution (equal protection) and is brought pursuant to 42 U.S.C.A. § 1983.

115.    The Agency at all relevant times was acting under color of state law.

116.    The Agency discriminated against the Farmers by treating them differently than farmers who stored grain at other state-licensed facilities.

117.    The Agency discriminated against the Farmers by putting their grain at risk.

118.    The Agency allowed SMI to violate the financial requirements for licensees from roughly 2012 to 2020, and nevertheless re-licensed SMI every year.

119.    The Agency granted SMI a license to display at each SMI location, while not requiring SMI to comply with licensing financial requirements.

120.    The Agency deprived Farmers of the right to equal protection under the law in that the Agency has treated Farmers differently from other similarly situated property owners and citizens. The actions of the Agency in treating Farmers differently from other property owners and citizens, and otherwise violating Farmers' civil rights, were arbitrary, capricious, and unreasonable and not supported by any legitimate state interest or narrowly tailored to effectuate any state interest.

### COUNT IV: STATE AND FEDERAL PROCEDURAL AND SUBSTANTIVE DUE PROCESS

121.    The Farmers incorporate the paragraphs above as if fully repeated here.

122.    This action arises under the Fifth and Fourteenth Amendments to the United States Constitution (due process clause) and is brought pursuant to 42 U.S.C.A. § 1983, and under Art. 1 § 12 of the Indiana Constitution (due course of law clause).

123.    Section 1 of the Fourteenth Amendment to the U.S. Constitution provides in pertinent part: "No state shall ... deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

124.    Section 12 of Article 1 of the Indiana Constitution affirms that: "All courts shall be open; and every person, for injury done to him in his person, property, or reputation, shall have remedy by due course of law."

125.    The Agency at all relevant times was acting under color of state law.

126.    The Farmers had a cognizable interest under the Due Process Clause of the Fourteenth Amendment of the United States Constitution and under the Due Course Clause of the Indiana Constitution to be free from state actions that deprived them of their right to life, liberty, or property in such a manner as to shock the conscience.

127.    The Agency violated the Farmers' due process rights by misrepresenting critical information to the Farmers about SMI. This includes, but is not limited to, the Agency's decision to withhold information about SMI's poor financial health and yet to re-license SMI year after year, inducing the Farmers to store grain at SMI.

128.    The Farmers have been deprived of their personal property—to wit, the grain they stored at SMI which was disappeared and for which the Agency refused to allow reimbursement from the Fund.

129.    In hiding SMI's financial information from the Farmers and in refusing to reimburse the Farmers for their lost grain at SMI, the Agency and those entities acting in concert with the Agency have deprived Farmers of their right to equal protection of the laws in that Farmers have received different treatment from that given to others dealing with state-licensed grain buyers and warehouses. The Agency's actions were arbitrary, capricious, and unreasonable, and not supported by any legitimate state interest.

130.    The Agency allowed SMI to violate the financial requirements for licensees from for years, and nevertheless re-licensed SMI every year.

131.    The Agency chose to re-license SMI without informing the Farmers with grain stored at SMI that SMI was in violation of the financial requirements for licensees and that the Farmers' grain was at risk.

132.    The Agency, by its action and inaction, has limited or eliminated Farmers' ability to use and enjoy their property. Such prohibitions and limitations do not substantially advance or have any nexus with any legitimate state interests.

133.    The Agency, by its actions and inactions, was unreasonable, arbitrary, and irrational. The Agency's actions and inactions were arbitrary and capricious exercises of its police power in violation of the Due Process Clause of the Fourteenth Amendment of the United States Constitution actionable under 42 U.S.C.A. § 1983 and in violation of the Indiana Constitution's Due Course Clause in Article 1 § 12.

134.    The Farmers are entitled to recover damages for the unlawful and unconstitutional acts of the Agency as alleged in this Complaint.

135.    The procedures used by the Agency to remedy the Farmers' deprivation were inadequate and violated Farmers' due process rights. The Agency hid critical financial information about SMI from the Farmers. The Agency refused to consider SMI's historical financial data in the Agency's possession when the Agency selected a "failure date" for SMI which limited the Farmers' ability to recover their losses from the state fund.

136.    The Agency did not hold a "shortage hearing" as required by statute.

137.    The Agency did not give the Farmers notice that the Agency would be making a decision about when SMI had "failed" under the statute.

138.    The Agency did not hold an open hearing to determine SMI's failure date.

139.    The Agency did not notify the Farmers of SMI's unsatisfactory financial condition as early as 2015.

140.    The Agency did not hold a proper hearing regarding SMI.

141.    The Agency has denied Farmers the use and enjoyment of their property—their grain and their funds paid into the state indemnity fund—which denial does not substantially advance, or have any nexus with, any legitimate state interests.

142.    The Agency infringed upon the rights, privileges or immunities secured to the Farmers by the Constitution and/or laws of the United States.

143.    The Farmers were damaged by the Agency's violation of Farmers' federal and state due process rights.

144.    As a result of this lawsuit, Farmers have become personally obligated to pay attorneys' fees, expert fees, court costs, and other expenses of lawsuit. Farmers are entitled under 42 U.S.C.A. § 1983 to an award of reasonable fees to cover said expenses.

145.    The Agency is liable to the Farmers.

## COUNT V: TAKING WITHOUT JUST COMPENSATION

146.    The Farmers incorporate the paragraphs above as if fully repeated here.

147.    The Agency has taken, destroyed, or interfered with the Farmers' property rights in the grain stored at SMI.

148.    The Agency has caused a substantial interference with the Farmers' grain which has destroyed or impaired their free use and enjoyment of the grain and their interest in the grain.

149.    The Agency has taken the Farmers' property without just compensation, a violation of Section 21 of the Indiana Constitution.

150.    The Agency deprived the Farmers, among other things, of their rights to own and reasonably use private property, in violation of the Fifth and Fourteenth Amendments to the United States Constitution. The Agency's taking of the Farmers' property is a violation of the Due Process and Takings Clause of the United States' Constitution.

### COUNT VI: VIOLATION OF SEPARATION OF POWERS

151.    The Farmers incorporate the paragraphs above as if fully repeated here.

152.    Article 3, Section 1 of the Indiana Constitution provides:

The powers of the Government are divided into three separate departments; the Legislative, the Executive including the Administrative, and the Judicial: and no person, charged with official duties under one of these departments, shall exercise any of the functions of another, except as in this Constitution expressly provided.

153.    The Agency is part of the executive department of the Indiana government.

154.    The Agency violated Art. 3 § 1 of the Indiana Constitution by exercising legislative functions.

155.    The Agency's decision to ignore SMI's failure to meet financial requirements for licensure violates Art. 3 § 1 of the Indiana Constitution.

156.    The Agency does have authority to strike down parts of the Indiana Grain Buyer Law, and yet that is what the Agency essentially did, by refusing to apply the Law and therefore causing damage to the Farmers.

157.    The Agency is liable to the Farmers for violating the separation of powers.

158.    Furthermore, the Farmers are entitled to injunctive relief prohibiting the Agency from striking down, ignoring, or refusing to enforce Indiana law.

### COUNT VII:  FRAUD

159.    The Farmers incorporate the paragraphs above as if fully repeated here.

160.    The Agency's renewal of SMI's grain buyer's license in 2012-2019 constituted actual fraud.

161.    The Agency represents that a grain buyer's license is a demonstration of the licensee's financial health, including that the licensee meets the financial requirements for licensure under Indiana law.

162.    The Agency knew that SMI did not meet the financial requirements for licensure from 2012-2019, yet the Agency renewed SMI's license during each of these years.

163.    The Agency knew that SMI's license would convey a message to farmers doing business with SMI that SMI met the financial requirements for licensure.

164.    The Agency knew that SMI would display its license at its locations for farmers to see.

165.    SMI did display its Agency-issued license at its locations.

166.    The Farmers relied upon SMI's Agency-issued license when delivering grain to SMI's facilities.

167.    Had the Agency not renewed SMI's license at any point from 2012-2019, the Farmers would not have delivered grain to SMI.

168.    The Agency's renewal of SMI's grain buying license, knowing it did not meet the statutory license requirements, was the proximate cause of the Farmers' losses.

169.    The Agency is liable to the Farmers.

**PRAYER FOR RELIEF**

Wherefore, the Farmers requests that Court enter judgment against the Agency and in Farmers' favor, including:

(a) Awarding Farmers damages for their lost grain;

(b) Awarding Farmers damages for additional expenses incurred by the Farmers because of the Agency's actions or inactions;

(c) Awarding Farmers consequential damages;

(d) Awarding Farmers attorneys' fees and costs;

(e) Entering a declaratory judgment in Farmers' favor;

(f) Awarding damages for the unlawful and unconstitutional acts of the Agency and the violation of the Farmers' civil rights including those protected by the Civil Rights Act, 42 U.S.C.A. § 1983, including all costs and expenses of lawsuit, including expert witnesses and reasonable attorneys' fees; and

(g) Awarding all other just and proper relief.

## JURY DEMAND

Plaintiffs demand a jury trial for all counts so triable.

Respectfully submitted:

/s/ Brianna J. Schroeder
Todd J. Janzen, Atty. No. 23615-49
Brianna J. Schroeder, Atty. No. 28772-64
Janzen Schroeder Agricultural Law LLC
8425 Keystone Crossing Suite 111
Indianapolis, Indiana 46240
(317) 855-9920
janzen@aglaw.us
schroeder@aglaw.us

25